### 36228. WEATHERS *v.* JONES.

DECIDED JUNE 12, 1956.

*Ronald F. Adams*, for plaintiff in error.
*Ernest Moran, Bennett, Pedrick & Bennett*, contra.

TOWNSEND, J. The sole issue before us is whether there is in the record sufficient evidence to sustain the finding of fact of the hearing director, that the widow claimant did not carry the burden of establishing that the employee was killed in an accident that arose out of his employment. The evidence is undisputed that the decedent was employed as a night watchman for the lumber company; that all of the clocks required to be punched by him on his rounds were in buildings of the company on the west side of the highway; that the company leased "quarters"

where company employees, both white and colored, lived, and some of these were on one side of the road and some on the other; that on the night in question a drunken brawl arose in the "quarters" on the east side of the road; that Weathers went over to quell the disturbance, and was shot by one of the participants and killed. It was also undisputed that Weathers had been deputized as a deputy sheriff and carried his badge and pistol with him when on duty.

On the question of whether the duties of employment of the deceased included his crossing over the highway to the quarters on the east side for the purpose of maintaining order, the testimony is in sharp conflict. It would have amply authorized a finding in favor of the claimant from all the testimony in the case, including the admission of Jones, the manager and husband of the owner, that he had on one occasion come by to pick up Weathers to go over there for this purpose, testimony that he regularly visited the quarters on his rounds, and the testimony of the widow, as follows: "Mr. Jones told my husband, 'Mr. Weathers, I want you to try and watch this place, I want you to try and get liquor out of there. If that liquor is got out of there, why, we can bring these Negroes under control' . . . it was Mr. Jones' orders to Mr. Weathers to watch the quarters and keep liquor out of there." The witness stated that these instructions were given in her presence. However, Jones testified as follows: "I did not know that Mr. Weathers had frequently crossed the highway in his employment, and he had no business over there. . . I don't know that Mr. Weathers frequently went to the quarters for the purpose of stopping disturbances that occurred at night. He didn't go on instructions from me. As a matter of fact, he had instructions not to go. I had him there as a night watchman. We have a plant there—the planer mill and the dry shed. . . Right in there is the place Mr. Weathers is supposed to be. I've cautioned him time and again because the shed is so long and I've told him just to patrol that shed. . . That was his place, and I didn't even want him to go to the store. . . I found years ago that I can't police and patrol and look after a bunch of folks at night. When they go home they are on their own to maintain order."

Gertrude Roland, wife of one of the participants in the brawl

in which Weathers was killed, testified that on the night in question he came by her house to bathe his hands; that she told him she was worried about her husband and intended to go and find him; that Weathers told her to stay there and make some coffee and he would go and find Roland. It was shortly after this that he was killed. The conversation was also testified to by Sherwood Roland, the witness's 14-year-old son, who in addition stated that he had frequently accompanied the deceased on his rounds; that on one occasion they heard a shot from the direction of the quarters, and Weathers told him he was not going over there; that he was not supposed to cross the highway.

There was, accordingly, sufficient evidence in the record to authorize a finding that the deceased had instructions not to patrol the quarters on the east side of the highway, and that on the night he was shot he went on a mission personal to himself rather than one connected with his employment, that is, to locate the husband of Gertrude Roland and bring him back, and that he had crossed over to the east side of the highway to the Roland house in the first instance in order to bathe his hands.

This case bears some resemblance to *Ladson Motor Co.* v. *Croft*, 212 *Ga.* 275 (92 S. E. 2d 103), wherein the Supreme Court reversed a finding by this court in favor of the compensation claimant, widow of a night watchman who was shot and killed, while drinking coffee at a restaurant some 25 feet off the premises, by an unknown assailant. In that case it was held (p. 276): "Though a presumption may arise that an employee's death arose out of and in the course of his employment where such employee dies on account of injuries received in a place where he may reasonably be expected to be in the performance of his duties (*Standard Accident Ins. Co.* v. *Kiker*, 45 *Ga. App.* 706 (5), 165 S. E. 850), such presumption disappears upon the introduction of evidence to the contrary." The evidence of the employer here, to the effect that the employee was specifically instructed not to go over into the area where he met his death, is, accordingly, sufficient to rebut the presumption that he was engaged in his duties, and also the testimony to that effect, and a denial of compensation is sustainable on the theory that at the time he was engaged in a mission personal to himself. This case, accordingly, does not fall within the class of *Continental Casualty Co.* v. *Weems*, 60 *Ga.*

*App.* 410 (3 S. E. 2d 846), where an employee receives injuries while doing an act for the benefit of his employer, which act, although not specifically authorized, is also not specifically forbidden by the instructions of the employer.

The judge of the superior court did not err in affirming the full board in denying compensation to the claimant.

*Judgment affirmed. Gardner, P. J., and Carlisle, J., concur.*